IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
JONESBORO DIVISION

BRANDY DENICE ADAMS                                              PLAINTIFF

v.                          NO. 3:16-cv-00303 PSH

NANCY A. BERRYHILL, Acting Commissioner                          DEFENDANT
of the Social Security Administration

MEMORANDUM OPINION AND ORDER

Plaintiff Brandy Denice Adams ("Adams") began this case by filing a complaint pursuant to 42 U.S.C. 405(g). In the complaint, she challenged the final decision of the Acting Commissioner of the Social Security Administration ("Commissioner"), a decision based upon findings made by an Administrative Law Judge ("ALJ").

Adams maintains that the ALJ's findings are not supported by substantial evidence on the record as a whole and offers four reasons why.[1] Adams first maintains that her pain disorder is a severe impairment, and the ALJ erred at step two of the sequential evaluation process when she failed to so find. Adams also maintains that her residual functional capacity was erroneously assessed. She so maintains because the record contains no physical assessment from a treating or examining physician and the assessment of her residual functional capacity does not take into account her pain disorder, depression, or anxiety.

---

[1] "Substantial evidence means less than a preponderance but enough that a reasonable person would find it adequate to support the decision." See Boettcher v. Astrue, 652 F.3d 860, 863 (8th Cir. 2011).

At step two, the ALJ is required to identify the claimant's impairments and determine whether they are severe. An impairment is severe if it has "more than a minimal effect on the claimant's ability to work." See Henderson v. Sullivan, 930 F.2d 19, 21 (8th Cir. 1992) [internal quotations omitted].

The ALJ is required to assess the claimant's residual functional capacity, which is a determination of "the most a person can do despite that person's limitations." See Brown v. Barnhart, 390 F.3d 535, 538-39 (8th Cir. 2004). The assessment is made using all of the relevant evidence in the record, but the assessment must be supported by some medical evidence. See Wildman v. Astrue, 596 F.3d 959 (8th Cir. 2010). As a part of making the assessment, the ALJ must evaluate the claimant's subjective complaints. See Pearsall v. Massanari, 274 F.3d 1211 (8th Cir. 2001). The ALJ does so by considering the medical evidence and evidence of the claimant's daily activities; the duration, frequency, and intensity of her pain; the dosage and effectiveness of her medication; precipitating and aggravating factors; and functional restrictions. See Id. at 1218.

Adams alleges in her application for supplemental security income payments that she became disabled on May 31, 2008, as a result of impairments that include epilepsy/seizures, back and leg pain, depression, and anxiety. Such payments are not payable, though, for any period prior to the protective filing date of the application. The relevant time period in this case is therefore from the protective filing date of the application, i.e., March 5, 2014, through the date of the ALJ's decision, i.e., October 29, 2015. The Court will nevertheless briefly review the evidence prior to March 5, 2014, for the purpose of placing Adams' application in an historical context.

2

A summary of the medical evidence reflects that prior to March 5, 2014, Adams experienced intermittent seizures. She sought treatment for her seizures and was prescribed medication that included Neurontin, Dilantin, and Depakote. See Transcript at 490 (12/23/2011), 488-489 (03/09/2012), 392-394 (09/06/2012), 483-484 (12/27/2012). A CT scan of her brain and an EEG were performed in October of 2012, and the results were unremarkable. See Transcript at 378-379, 387-389.

Prior to March 5, 2014, Adams also experienced significant pain in her back and legs, the latter apparently caused by nerve damage. She was prescribed a number of medications that provided temporary relief. A CT scan of her lumbar spine performed in September of 2010 showed an "L5 pars defect ... with osteophyte fragment encroaching into the spinal canal ..." See Transcript at 501. An MRI of her lumbar spine performed in January of 2011 showed degenerative disc changes and a "subtle grade I anterolisthesis at L5-S1" believed to be secondary to the pars defect. See Transcript at 497. Adams was seen for her back pain in June of 2012, and tenderness was noted in her back at L5-S1. See Transcript at 485-486. She was seen for her back and leg pain on two separate occasions in July of 2012. See Transcript at 403-405, 401-402. She reported neuropathy in all of her extremities, particularly her left leg. MRI testing was performed in July of 2012, and the results were unremarkable. See Transcript at 398-400. A third MRI of her lumbar spine was performed in September of 2013. See Transcript at 315-316. The results of the MRI revealed no obvious source of Adams' left leg pain and "no evidence of any disc herniation, stenosis, or focal neural impingement" at any level, including L5-S1. See Transcript at 316.

Prior to March 5, 2014, Adams experienced problems associated with depression and anxiety. She was seen by Dr. Samuel Hester, Ph.D., ("Hester") for a mental diagnostic evaluation in April of 2013. See Transcript at 304-312. Hester diagnosed, inter alia, a pain disorder associated with both medical and psychological factors, a depressive disorder, an anxiety disorder, and post-traumatic stress disorder. With respect to the effects of Adams' impairments on her adaptive functioning, Hester opined that Adams was capable of performing most of her activities of daily living autonomously; was capable of communicating and interacting in a socially adequate, intelligible, and effective manner; and could cope with the mental demands of basic work tasks. He also opined that she had the ability to attend and sustain concentration on basic tasks, had the ability to sustain persistence in completing tasks, but may not be able to complete work tasks within an acceptable timeframe due to pain issues.

Within the relevant period, Adams was seen by Dr. Kristi Statler, M.D., ("Statler") on March 11, 2014, after experiencing a seizure. See Transcript at 351-355. Adams reported that she was experiencing stress and increased pain. Adams reported that Nucynta was not helping alleviate her pain, and Statler prescribed Percocet.

On April 22, 2014, Adams was seen by Dr. Catherine Hubbard Adams, Ph.D., for a mental diagnostic evaluation. See Transcript at 319-324. Adams reported a history of depression and anxiety. She also reported a history of seizures but noted that they were being managed with Depakote. Her mood was euthymic, and her affect was appropriate. Dr. Catherine Hubbard Adams diagnosed a mood disorder due to epilepsy and offered the following findings with respect to Adams' adaptive functioning:

>How do mental impairments interfere with this person's day to day adaptive functioning? … Claimant's difficulties interfere with age-appropriate driving, shopping, and social interactions. Other tasks are completed independently as pain level will allow.
>
>Capacity to communicate and interact in a socially adequate manner? … Claimant's interactions during interview were appropriate.
>
>Capacity to communicate in an intelligible and effective manner? Claimant communicated in a manner that was effective and intelligible.
>
>Capacity to cope with the typical mental/cognitive demands of basic work-like tasks? Claimant seems to have difficulty coping with work-type demands.
>
>Ability to attend and sustain concentration on basic tasks? The claimant seems to have difficulty attending and sustaining concentration on basic tasks.
>
>Capacity to sustain persistence in completing tasks? It seems claimant has difficulty sustaining persistence in completing work tasks.
>
>Capacity to complete work-like tasks within an acceptable timeframe? Claimant seems to have difficulty completing tasks within an acceptable timeframe.

See Transcript at 323.

In May of 2014, a CT scan of Adams' lumbar spine showed bilateral spondylolysis at L5, no significant spondylolisthesis, mild disc bulging at L3-L4 and L4-L5, and facet arthropathy but no stenosis. See Transcript at 441-442. She was diagnosed with a lumbar strain and prescribed medications that included Robxin, Medrol, and Ultram.

Adams continued to seek medical attention for her seizures. See Transcript at 332-334 (07/03/2014), 341-343 (07/10/2014). She reported that she stopped taking Depakote at one point but began taking it again, and she was doing well and having no seizures. See Transcript at 432-433 (01/08/2015).

On April 14, 2015, Statler saw Adams for her complaints of back and leg pain. See Transcript at 427-430. Adams reported having fallen, landing on her lower back. She reported that the resulting pain was running down both her legs, and her medication was ineffective. Statler adjusted Adams' pain medication.

On April 22, 2015, another MRI was performed of Adams' lumbar spine. See Transcript at 424-425. The results of the MRI showed "[m]inimal posterior disc bulging at L4-L5;" "thickening ligamentum flavum;" and facet hypertrophy, which caused "mild bilateral neural foraminal narrowing." See Transcript at 425.

Statler saw Adams again on June 18, 2015. See Transcript at 446-448. Statler noted, inter alia, that Adams' seizures were "still controlled – July 3 will be one year seizure free." See Transcript at 446. Statler diagnosed neuropathy, a seizure disorder, and depression.

On August 22, 2015, Adams presented to a hospital emergency room following an automobile accident. See Transcript at 462-464. The attending physician's notes reflect that "[Adams] self-extricated and felt a pop in her middle back along with increased back pain." See Transcript at 462. Adams subsequently fell and began to develop muscle twitches. Upon examination, she was positive for back pain and arthralgia.

On September 4, 2015, Adams sought medical attention for worsening left hip pain and chronic low back pain. See Transcript at 456-461. She reported that the pain ran down the back of her leg and spiked with hip flexion and extension. Testing was negative for a fracture but did show pre-existing spondylolisthesis. Minor left sciatica pain and minor neuropathic pain were diagnosed, and her medication was increased.

On September 23, 2015, Adams was seen by Dr. Terry Hunt, M.D., ("Hunt") for a re-fill of Adams' medication. See Transcript at 504-505. Adams reported that she experienced a "hard seizure" when she stopped taking Depakote but was back taking the medication. See Transcript at 504. Adams reported, or Hunt found, the following: "lower back pain, lumbar spine painful on movement, lumbar pain on palpation, is chronic, is unrelenting, causing difficulty finding a comfortable position, and muscle spasm." See Transcript at 504. Adams also reported some tingling in her leg. Hunt diagnosed a lower backache and peripheral neuropathy and prescribed Percoet, Depakote, and Klonopin.

On October 13, 2015, Adams saw Hunt following Adams' involvement in an automobile accident. See Transcript at 502-504. Adams reported muscle spasms and tingling and worsening pain in her legs. Hunt prescribed oxycodone-acetaminophen and Parafon Forte and ordered an MRI. It is unclear whether the MRI was ever performed.

Adams presented to Hunt a third time on November 3, 2015. See Transcript at 502. She continued to complain of back pain, and an examination of her lumbar spine revealed tenderness on palpation. A straight-leg raising test was negative. She was prescribed medication and instructed to perform range of motion exercises at home.

Adams' medical records were reviewed by state agency medical professionals. See Transcript at 99-112, 113-128. With respect to her physical limitations, they opined that she had no exertional limitations but should avoid all exposure to hazards. With respect to her mental limitations, they opined that she was capable of performing unskilled work.

7

A summary of the non-medical evidence indicates that Adams had minimal earnings until her alleged onset date. See Transcript at 164. She testified during the administrative hearing that she last worked between the years 2007 and 2008. See Transcript at 78.

Adams and third parties completed a series of documents in connection with her application for supplemental security income payments. See Transcript at 251-252, 253-260, 261-262, 263-264, 265-266, 267-268. In the documents, she represented that she experiences pain in her back, hips, and legs "every day, all day, [and it] never stops." See Transcript at 251. She can only stand/walk and sit for approximately five minutes before she experiences pain. Her seizures have grown more severe, and her memory is growing worse. She cares for her children and a grandson, can attend to most of her own personal care, can prepare simple meals, and can perform some household chores. She can shop in stores but cannot drive to do so because of her seizures. She spends time with others, attends church every Sunday, and attends her children's activities.

Adams testified during the administrative hearing. See Transcript at 76-91. She was born on February 15, 1977, and was thirty-eight years old at the time of the hearing. She lives with her husband and her three children. She smokes a half a pack of cigarettes each day but does not use alcohol. She last worked in 2008 and stopped working because she fractured her vertebra at L4-L5 in an off-the-job accident. Adams can cook meals, do laundry, clean, but cannot do any outside work. She continues to experience pain in her back, hips, and legs, but Gabapentin and Percocet help alleviate some of the pain. She was seizure free for a significant period of time but experienced

8

one as recent as August of 2015 even though she was taking Depakote. The seizures give no warning signs and cause severe headaches, headaches that continue to persist. She also experiences "electrical surges" that incapacitate her for an entire day. See Transcript at 87. When asked if she were getting any mental health treatment, she answered, "No, actually I've done really well." See Transcript at 88. Adams was instructed to avoid lifting weight in excess of two pounds, and she cannot stand/walk for more than five to ten minutes at one time. She can sit for approximately one hour as long as she can switch positions while seated.

The ALJ found at step two that Adams has severe impairments in the form of a "seizure disorder, lumbar disc bulging and facet arthropathy and neuropathy, depression, anxiety, and post-traumatic stress disorder." See Transcript at 14. The ALJ assessed Adams' residual functional capacity and found that she can perform sedentary work but must avoid all hazards, must have a sit/stand option of changing positions every thirty minutes, and can perform unskilled work, i.e., SVP 1-2 jobs. The ALJ supported the foregoing assessment by observing the following:

> … It is reasonable to conclude that [Adams] has at least some limitation in her ability to sit, stand, and walk, which is accounted for in this decision's residual functional capacity assessment. There is no objective evidence, however, that her residual symptoms are so severe that they preclude her from lifting and carrying 10 pounds as well as sitting for 6 hours, with normal breaks, consistent with sedentary work. Her subjective reports of back pain and seizures without warning support a limitation of avoiding all hazards. In addition, her subjective reports regarding ongoing back pain warrant a sit/stand option of changing positions every 30 minutes. [Her] musculoskeletal and neurological function was normal. In addition, treatment for her back and leg pain was conservative. Finally, [she] was seizure-free for one year until recently after an August 2015 motor vehicle accident, but has had no seizures since the accident.

> [Adams] also requires psychotropic medications to control symptoms of depression, anxiety disorder and [post-traumatic stress disorder]. It is reasonable to conclude that [her] residual symptoms from these conditions reduce her ability to remember and concentrate at least somewhat. There is no objective evidence, however, that the residual symptoms are so severe that they seriously interfere with her ability to function independently, appropriately, effectively, and on a sustained basis. This supports a finding that she retain at least the ability to perform unskilled work of SVP 1-2 jobs. [Her] mental status examinations were normal. Moreover, [her] mental health treatment was conservative, consisting of medications prescribed by her primary care provider. Finally, [she] testified that she currently was not receiving counseling or psychiatric care.

See Transcript at 21. The ALJ found at step four that Adams cannot return to her past work but found at step five that there is other work she can perform.

Adams maintains that her pain disorder is a severe impairment, and the ALJ erred when she failed to so find. It is true that the ALJ did not specifically identify a pain disorder as one of Adams' severe impairments, but the ALJ's failure to do so does not warrant a remand. The Court so finds for two reasons. First, the evidence supporting the impairment is minimal. Hester admittedly diagnosed the impairment in his April of 2013 mental diagnostic evaluation, and the ALJ gave Hester's opinion some weight. Dr. Catherine Hubbard Adams, though, performed a mental diagnostic evaluation one year later and made no such diagnosis, an opinion the ALJ also gave some weight. Second, assuming there is evidence to support the impairment, the ALJ found that Adams experiences "intermittent back pain" caused by "degenerative disc disease of the lumbar spine with arthropathy and neuropathy" and suffers from mental impairments. See Transcript at 21. The ALJ's findings can reasonably be understood to subsume or otherwise account for a pain disorder with medical and psychological factors.

10

Adams maintains that her residual functional capacity was erroneously assessed because the record contains no physical assessment from a treating or examining physician and the assessment of her residual functional capacity does not take into account her pain disorder, depression, or anxiety. For the reasons that follow, though, the Court finds that substantial evidence on the record as a whole supports the ALJ's assessment of Adams' residual functional capacity.

First, the ALJ adequately considered the medical evidence relevant to Adams' physical and mental impairments. With respect to Adams' seizures, the ALJ could and did note that the test results prior to March 5, 2014, were unremarkable, specifically, a CT scan of her brain and an EEG produced no significant findings. The ALJ nevertheless credited the findings and observations of the medical professionals who examined Adams, credited Adams' self-reports, and found that she has a history of seizures. The ALJ could and did also find that Adams experiences "disorientation and fatigue from the diagnosed seizure disorder …" See Transcript at 21. It is not insignificant that she appears to have gone from July of 2014 to July of 2015 without having a seizure. Although she experienced one or more seizures in July and/or August of 2015, she did not experience one from August of 2015 through the date of the ALJ's decision denying the application.

With respect to Adams' back and leg pain, the ALJ could and did note that testing conducted prior to March 5, 2014, revealed some degenerative disc changes in the lumbar portion of Adams' spine. A May of 2014 CT scan of Adams' lumbar spine showed, inter alia, bilateral spondylolysis at L5, mild disc bulging at L3-L4 and L4-L5, and facet arthropathy. An MRI performed in April of 2015 showed "[m]inimal posterior disc bulging

at L4-L5;" "thickening ligamentum flavum;" and facet hypertrophy, which caused "mild bilateral neural foraminal narrowing." See Transcript at 425. These findings provide a medical basis for Adams' back and leg pain, and the ALJ could and did properly find that Adams experiences intermittent back pain caused by degenerative disc disease of the lumbar spine.

With respect to Adams' mental impairments, the ALJ could and did credit Hester and Dr. Catherine Hubbard Adams' opinions that Adams has mental impairments. Hester diagnosed a pain disorder associated with both medical and psychological factors, a depressive disorder, an anxiety disorder, and post-traumatic stress disorder. Dr. Catherine Hubbard Adams diagnosed a mood disorder due to epilepsy. The ALJ could and did give some weight to the opinions and find that Adams' severe impairments include depression, anxiety, and post-traumatic stress disorder. The ALJ also could and did find that the impairments impact Adams' ability to perform the full range of work.

Second, the ALJ adequately considered the non-medical evidence relevant to Adams' physical and mental impairments. The ALJ could and did find that Adams can perform most activities of daily living. It is true that Adams cannot drive an automobile because of her seizures. She can, though, care for her children and a grandson, attend to most of her own personal care, prepare simple meals, perform some household chores, and shop in stores. Although she experiences episodes of depression and anxiety, she is able to spend time with others, attend church every Sunday, and attend her children's activities.

The ALJ considered Adams' treatment and use of medication for her physical and mental impairments. The ALJ found the following with respect to those matters:

> … [T]he nature of treatment does not support the claim of physical or mental disability. Treatment was solely conservative in nature, consisting of medication use. In addition, the claimant did not receive injections or undergo long-term pain management or surgery for her back and leg pain. Treatment for the claimant's depression, anxiety, and post-traumatic stress disorder … was also conservative, consisting of medication prescribed by her primary care provider … The claimant neither sought nor received counseling or psychiatric care.

See Transcript at 19. The ALJ could find as she did as Adams received conservative treatment for impairments.

With regard to other matters, the ALJ could and did give some weight to the opinions of the state agency medical professionals. With respect to Adams' physical limitations, they opined that she had no exertional limitations but should avoid all exposure to hazards. With respect to her mental limitations, they opined that she was capable of performing unskilled work. It is also worth observing that Adams has a poor work record, having only worked sporadically until her alleged onset date.

Adams challenges the assessment of her residual functional capacity because the record contains no physical assessment from a treating or examining physician. It is true that there is no assessment of her physical abilities by a treating or examining physician. Although such an assessment might have been helpful, a remand is not warranted because the record contains ample evidence for the ALJ to have made an informed decision. "[T]here is no requirement that a [residual functional capacity] finding be supported by a specific medical opinion," see Hensley v. Colvin, 829 F.3d 926, 932 (8th Cir. 2016), and the ALJ has the discretion whether to order a consultative examination, see Sultan v. Barnhart, 368 F.3d 857, 863 (8th Cir. 2004). The ALJ did not abuse that discretion in this instance.

Adams also challenges the assessment of her residual functional capacity because the assessment does not take into account her pain disorder, depression, or anxiety. The Court cannot agree. Dr. Catherine Hubbard Adams opined, and the ALJ gave some weight to the opinions, that Adams has difficulty coping with work-type demands, attending and sustaining concentration on basic tasks, sustaining persistence in completing work tasks, and completing tasks within an acceptable timeframe. The ALJ found, inter alia, that Adams was limited to unskilled work, i.e., SVP 1-2 jobs. Adams has not shown how the ALJ's findings are inconsistent with the opinions.

Adams offers a third reason why the ALJ's findings are not supported by substantial evidence on the record as a whole. Adams maintains that the ALJ's hypothetical questions to a vocational expert were inadequately crafted. Adams so maintains because the ALJ's questions "failed to mention Adams' complaints of pain, although the ALJ did acknowledge that Adams had pain despite failing to treat her pain disorder as a severe impairment." See Docket Entry 11 at CM/ECF 28.

Testimony from a vocational expert is substantial evidence on the record as a whole when "the testimony is based on a correctly phrased hypothetical question that captures the concrete consequences of a claimant's deficiencies." See Taylor v. Chater, 118 F.3d 1274, 1278 (8th Cir. 1997). The question must include all of the claimant's impairments that are substantially supported by the record as a whole. See Id.

A vocational expert testified during the administrative hearing. See Transcript at 91-95. She was asked about a hypothetical individual with Adams' limitations. The vocational expert testified that the individual could not perform Adams' past work but could perform work as a document preparer and charge account clerk.

The ALJ did not err in crafting the hypothetical questions. They captured the concrete consequences of Adams' limitations and were adequately phrased. Adams faults the ALJ for failing to incorporate into the questions the pain caused by Adams' back and leg impairments. Although the ALJ did not specifically mention "pain" in her questions, she clearly incorporated a limitation for pain into her questions as she limited the hypothetical individual to a "sit/stand option every 30 minutes for position change." See Transcript at 93.

Adams offers a fourth reason why the ALJ's findings are not supported by substantial evidence on the record as a whole. Adams maintains that the vocational expert's testimony conflicts with the Dictionary of Occupational Titles ("DOT"). Adams maintains that the finding that the hypothetical individual is limited to a sit/stand option of changing positions every thirty minutes is inconsistent with the requirements of sedentary work, i.e., the work the individual can perform.

The vocational expert was asked whether her testimony conflicts with the DOT. She testified that her testimony was consistent with the DOT and "[her] experience." See Transcript at 94. The ALJ adopted the testimony and found that it was consistent with the DOT. The ALJ did not err in so finding. It is true that the DOT does not expressly include a sit/stand option in its description of the jobs of document preparer and charge account clerk. As the Commissioner correctly notes, though, the DOT's silence "does not mean that [vocational expert] testimony that fleshes out a requirement of a given position in greater detail 'conflicts' with [the DOT]." See Docket Entry 12 at CM/ECF 17. To the contrary, the vocational expert's testimony supplements the DOT. In that regard, the Court adopts the following excerpt from the Commissioner's brief:

> … the [DOT's] … lack of specificity was properly supplemented by the testimony of the [vocational expert], as is completed by the regulations. See 20 C.F.R. 416.966(d). In fact, [Social Security Ruling] 00-4p states in pertinent part:
>
>> The DOT lists maximum requirements of occupations as generally performed, not the range of requirements of a particular job as it is performed in specific settings. A [vocational expert], VS, or other reliable source of occupational information may be able to provide more specific information about jobs or occupations than the DOT.
>
> SSR 00-4p. Thus, in the instant case, the ALJ properly relied on the [vocational expert] to bridge the DOT's descriptions, the agency regulations, and the hypothetical. …

See Docket Entry 12 at CM/ECF 17.

On the basis of the foregoing, the Court finds that there is substantial evidence on the record as a whole to support the ALJ's findings. Adams' complaint is dismissed, all requested relief is denied, and judgment will be entered for the Commissioner.

IT IS SO ORDERED this 28th day of June, 2017.

_____
UNITED STATES MAGISTRATE JUDGE